UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KENESA DARLENE EVANS**,                    Case No. 5:12 CV 2043

              Plaintiff,                    Judge Donald C. Nugent

     v.                                        REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

              Defendant.                    Magistrate Judge James R. Knepp II

## INTRODUCTION

Plaintiff Kenesa Darlene Evans seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3) and 405(g). This case was referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 17, 2012). For the reasons given below, the undersigned recommends remanding the Commissioner's decision for further explanation of Plaintiff's RFC when she is not abusing substances.

## BACKGROUND

Procedural History

On August 19, 2010, Plaintiff filed applications for SSI and DIB, stated she was disabled due to panic disorder, agoraphobia, generalized anxiety disorder, post-traumatic stress disorder, and back pain, and alleged a disability onset date of November 3, 2008. (Tr. 108, 206, 208, 238). Her claims were denied initially (Tr. 108–28) and on reconsideration (Tr. 132–53). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 182). Born April 12, 1976, Plaintiff was 35 years old when the hearing was held on December 5, 2011. (Tr. 49, 108). Plaintiff (represented by

counsel), her case worker Keith Terlonge, and a vocational expert (VE) testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 23–42, 49–107). In her Brief on the Merits, Plaintiff only challenges the ALJ's conclusions on her mental impairments (*see* Doc. 18), and therefore waives any claims about the determinations regarding physical impairments. *See, e.g., Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (noting failure to raise a claim in merits brief constitutes waiver). Therefore, the undersigned only addresses health records pertinent to Plaintiff's mental impairments.

Vocational History and Reports to the Agency

Plaintiff graduated from high school and completed two years of college. (Tr. 239). Her past work included jobs as a veterinarian assistant and dancer. (Tr. 239). She also worked at a tanning salon. (Tr. 250). Plaintiff said anxiety problems caused problems at work and she had a difficult time leaving her house. (Tr. 257). She reported caring for her pets, doing "some things around [the] house", and watching movies. (Tr. 263). Plaintiff indicated trouble sleeping and said she sometimes lacked the motivation to bathe and shave, but could cook simple meals. (Tr. 263–64). She said she could complete household chores with rest breaks but needed reminders to keep her house clean. (Tr. 265). Plaintiff later stated her boyfriend did all the cooking and shopping. (Tr. 282). She said she enjoyed spending time with her pets, latch hook, playing cards and computer games, and reading, but sometimes was not interested in those activities. (Tr. 266, 284). She explained she sometimes did not want to do anything and had to stay in bed. (Tr. 266, 281). Plaintiff said she did not handle change or stress well and sometimes became nauseous due to anxiety. (Tr. 268). Plaintiff also reported she sometimes missed doctor appointments because she needed to be with someone whenever she left the house. (Tr. 269, 275). Plaintiff said she hated her anxiety and felt her

2

symptoms were getting worse. (Tr. 287).

Pre-Alleged Onset Date Medical History

Plaintiff's psychological problems date back to early 1993 when she was sixteen. (Tr. 317). She was pregnant and became hysterical upon hearing her boyfriend had gone back to his ex-girlfriend, threatening to kill the other girl and becoming belligerent and combative. (Tr. 317). Plaintiff told the psychologist she was depressed, but she appeared very much in control and did not exhibit psychiatric symptoms. (Tr. 317). Records indicated Plaintiff also spent ten days in a psychiatric hospital in 1992. (Tr. 318).

Plaintiff went to the emergency room with anxiety symptoms three times in 2006, complaining of chest pain, shaking, and difficulty sleeping, but denying suicidal ideation, stressors, or substance abuse. (Tr. 324, 328–29). She returned once in 2007 after suffering an anxiety attack with numerous physical symptoms at the dental clinic with her boyfriend. (Tr. 331–32). Plaintiff said there was no obvious trigger for the panic attack but admitted she had not taken her Ativan. (Tr. 332). She said she drank occasionally but denied cocaine use. (Tr. 332). She also went to the emergency room with another panic attack in March 2008, presenting with chest pain and shortness of breath and explaining her panic attacks were happening more frequently. (Tr. 334, 336). Additionally, Plaintiff treated with Dr. Inman in 2007 and 2008, who diagnosed her with anxiety and panic attacks and prescribed medication. (Tr. 386, 392, 398–99, 404, 406). At times her psychological examination was positive for anxiety (Tr. 394), but her mental status examinations were generally unremarkable (Tr. 387–88, 391–93, 396–97, 399–400, 402, 405–06).


Medical History Before Plaintiff Lost Custody of Her Children

On January 31, 2009, Plaintiff went to the emergency room after she snorted a line of cocaine and experienced anxiety, a racing heart, and other panic attack symptoms. (Tr. 341). Plaintiff had never used cocaine before and after being treated with Ativan she felt much improved, was not suicidal, wanted to go home, and promised never to use cocaine again. (Tr. 340–41).

Beginning in 2009, Plaintiff treated her mental health issues at Phoenix Rising Behavioral Healthcare and Recovery Center and continued treating there with Dr. Krutarth Choksi, Mr. Michael Hunyadi, and Mr. Keith Terlonge through 2011. (Tr. 573). Although their treatment notes showed a number of fairly normal mental status examinations and Plaintiff often denied substance abuse (*see, e.g.,* Tr. 527, 529, 531, 567–68, 593, 650, 652, 660, 662, 664, 668, 684, 692, 704), the details of her visits showed she struggled for several years with psychiatric symptoms, both before and after she stopped drinking.

When she first presented for counseling with Mr. Hunyadi on March 25, 2009, Plaintiff needed assistance with anxiety and had difficulty coping. (Tr. 573). She said medication helped, mentioned she had good relationships with her two daughters, and said her boyfriend was her primary support system, but noted she mainly kept to herself. (Tr. 573–74). Plaintiff said she lost her previous job due to anxiety problems, accidentally tried cocaine recently, used to get drunk with friends, and had to go to Quest and AA meetings after her second DUI. (Tr. 575, 577). She also reported frequent panic attacks, a constant feeling of nervousness, and beginning feelings of agoraphobia. (Tr. 578). Plaintiff was diagnosed with panic disorder with agoraphobia and alcohol abuse and assigned a current Global Assessment of Functioning (GAF) score of 68.[1] (Tr. 582). She

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 61–70 reflects some mild

appeared nervous and tense and had difficulty sitting still and expressing emotions. (Tr. 593).

On April 1, 2009, psychiatrist Dr. Choksi prescribed Ativan and indicated Plaintiff was afraid to go places. (Tr. 566–67). Plaintiff said there was often no clear reason for the start of her anxiety attacks, which occurred up to four times a day. (Tr. 567). She was severely anxious and mildly irritable, restless, and withdrawn. (Tr. 568). Dr. Choksi diagnosed panic disorder with agoraphobia and alcohol abuse. (Tr. 568).

On June 24, 2009, police escorted an intoxicated Plaintiff to the emergency room. (Tr. 346). She said she ran out of Ativan and her dog ran away while she was doing cocaine. (Tr. 346). She was very tearful and anxious, emotionally labile, wanted to hurt herself, and was scratching herself. (Tr. 346). Plaintiff's blood alcohol level was 0.19 and she tested positive for cocaine. (Tr. 346). She was diagnosed with depression and alcohol intoxication and discharged when she was no longer suicidal. (Tr. 345). Three days later, Plaintiff went back to the emergency room and complained of anxiety, stating she had been out of Ativan for several months and was experiencing life stressors. (Tr. 348). She denied suicidal ideation but was very anxious and cried. (Tr. 348). Her blood alcohol level was 0.15. (Tr. 348). After evaluation, she was discharged with Ativan. (Tr. 348–49).

The police took Plaintiff back to the emergency room on July 2, 2009 because she reported suicidal thoughts after not being able to sleep for four days. (Tr. 350). Plaintiff was "sick and tired [of] everything" but denied a definite plan to harm herself. (Tr. 350). She admitted drinking but denied using other drugs; however, she said she took three tablets of someone's Klonopin in an attempt to sleep. (Tr. 350). After evaluation, Plaintiff was not suicidal and her main problem was

---

symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. *DSM-IV-TR*, at 34.

5

insomnia related to depression. (Tr. 352). She was discharged with a prescription for Trazadone and a refill of Ativan. (Tr. 352).

<u>Medical History After Plaintiff Lost Custody</u>

On July 10, 2009, social services took Plaintiff's children after finding cocaine at her residence, and Plaintiff was transported to the hospital via rescue squad after her boyfriend called police when she threatened suicide. (Tr. 354). She had been drinking, "just wanted to go to sleep and take all her [T]razadone", and wanted "to end it all." (Tr. 354). She had not been taking her medications as prescribed and had not been able to sleep. (Tr. 354). She admitted drinking daily but denied using cocaine. (Tr. 354). Plaintiff was crying, with slurred speech, and her blood alcohol level was 0.27. (Tr. 354, 356). After she was no longer intoxicated, Plaintiff felt more stable and was no longer suicidal. (Tr. 353). She said she "says some foolish things when she is drinking" and was discharged with instructions to keep her appointment with her psychologist. (Tr. 353).

On July 16, 2009, Plaintiff told Dr. Choksi she was under a lot of stress and had been hospitalized multiple times. (Tr. 668). She also said she had been drug free for about two months and missed a previous appointment due to lack of transportation. (Tr. 668). Her sleep was poor, she reported a very high anxiety level, and she was afraid to leave her house. (Tr. 668). On July 31, 2009, Plaintiff saw Mr. Hunyadi for counseling and was depressed, had increased anxiety, and had made no progress. (Tr. 648). Plaintiff returned to Dr. Choksi on August 5, 2009 and said she was under a lot of stress, noting medication helped but she felt anxious. (Tr. 666). On August 13, 2009, Plaintiff was still tearful and angry. (Tr. 647).

The police once again took Plaintiff to the emergency room on August 17, 2009 because she became overwhelmed and started to have plans of killing herself. (Tr. 359–60). Plaintiff broke down

and cried, explaining her custody issues. (Tr. 360). She had been drinking all day and tried to cut her wrist. (Tr. 366).  Plaintiff felt alone, hopeless, and helpless and had not been taking her medications. (Tr. 360). She was labile, suicidal, overwhelmed, and reported auditory hallucinations. (Tr. 360, 366). Her speech was a little pressured but she had no psychosis and despite suicidal thoughts she was alert, oriented, and cognitively intact, with good insight and judgment. (Tr. 360). On admission, her GAF was less than 20, but when she was sober and no longer suicidal at discharge, it increased to 70.[2] (Tr. 359, 363).

When Plaintiff saw Dr. Choksi on August 27, 2009, she reported good compliance with medication, felt much better, and denied current suicidal thoughts. (Tr. 664). However, Plaintiff's mood was down and tense and she cried at times, reported mood swings, and said she occasionally heard people laughing at her when she was alone. (Tr. 664). On August 28, 2009, Plaintiff met with her case worker Mr. Terlonge and was very drowsy with slightly slurred speech. (Tr. 646). She missed her children but was not depressed, expressed fears, and explained she had trouble sleeping. (Tr. 646). She said she no longer had the urge to hurt herself and admitted doing cocaine. (Tr. 646). At a September 10, 2009 meeting with Mr. Terlonge, Plaintiff broke into tears and said she was having hallucinations but denied suicidal ideation. (Tr. 645). She was very distraught about her romantic relationship and felt very lonely despite taking medications as directed. (Tr. 645).

The police took Plaintiff to the emergency room again on September 16, 2009 after she cut her left wrist. (Tr. 372). She had experienced significant stressors that day, admitted drinking, had

---

2. A GAF between 11 and 20 reflects some danger of hurting self or others (e.g., suicide attempts without clear expectations of death; frequent violence; manic excitement); or occasional failure to maintain minimal personal hygiene; or gross impairment in communication. *DSM-IV-TR*, at 34; *see also* footnote 1, *supra*.

some abrasions on her wrists, and was tearful. (Tr. 372). When she was sober and reevaluated, she was alert and oriented, knew she was "doing stupid thing[s]", and was not suicidal. (Tr. 371). She was discharged in stable condition. (Tr. 371).

Plaintiff was very tired when she saw Mr. Terlonge on September 23, 2009, reporting she had not slept in a day or two. (Tr. 644). She needed to be calmed down and reported her landlords kicked her out due to her relationship with her ex-boyfriend. (Tr. 644). She planned to work at a club to earn money but did not know how long she could work without having a breakdown. (Tr. 644). Plaintiff became overwhelmed and said she would go to additional AA meetings. (Tr. 644). The next day, Plaintiff saw Dr. Choksi, said she had seen better days, reported ongoing stress, cried, and was sad and on-edge but denied feeling suicidal. (Tr. 662–63). On October 1, 2009, Plaintiff told Mr. Terlonge she was doing fine; the next day she cried and had anxiety about personal relationships, but Mr. Hunyadi noted her anxiety was reduced and her attitude was better overall. (Tr. 641–43).

When Plaintiff saw Mr. Terlonge on October 22, 2009, she was very upset about being unable to see or contact her daughters and explained she missed her last visit because she thought it was a different day. (Tr. 639). She was frustrated and cried easily. (Tr. 639). The same day, she told Dr. Choksi her medications helped but cried and reported ongoing stress, sad mood, unhappiness, and feeling on-edge. (Tr. 660). On October 28, 2009, Plaintiff's mood and affect were notable for depression and anxiety and she had made no progress. (Tr. 638). Plaintiff was very upset about a conflict with her mother when she saw Mr. Terlonge on November 3, 2009. (Tr. 637). On November 11, 2009, Plaintiff presented for counseling with increased depression and had made no progress. (Tr. 636). On November 25, 2009, Mr. Hunyadi noted Plaintiff had missed a few Depakote doses, had mood fluctuations, and was "seeing stuff". (Tr. 634). Plaintiff had increased stress and

depression and was frustrated she had not seen her daughters over Thanksgiving. (Tr. 634). Once again, Plaintiff had made no progress. (Tr. 634). On December 11, 2009, Mr. Hunyadi noted increased depression and tearfulness and again stated Plaintiff had made no progress. (Tr. 633). On December 17, 2009, Plaintiff met with her CPS worker and Mr. Terlonge for a visit with her children and became very upset when they allowed her mother and brother to sit in on the visit. (Tr. 632). She had to go to a different room to calm down but understood she needed to make life changes to regain custody of her children. (Tr. 632, 635).

On January 7, 2010, Plaintiff told Dr. Choksi she was "doing ok" and complied with her medications but still experienced big mood swings for little reason. (Tr. 531). During a session with Mr. Terlonge on January 11, 2010, Plaintiff cried and had accelerated speech. (Tr. 557). She said she continued to attend Quest appointments and AA meetings and had not consumed alcohol "in a very long time." (Tr. 557). Notes indicated Plaintiff was having more panic attacks, could not do side jobs, and even had trouble walking her dogs. (Tr. 557). When Plaintiff returned to Mr. Terlonge on January 15, 2010, she cried and bordered on hyperventilation when discussing CPS and her children. (Tr. 555). Mr. Terlonge helped her complete an application for social security and Plaintiff elaborated on how anxiety affected her on a daily basis, explaining coping skills did not always work and stating she frequently had to leave work to sit in a corner to calm herself. (Tr. 555–56).

On January 21, 2010, Mr. Terlonge attended a court hearing with Plaintiff. (Tr. 554). Plaintiff began to cry at the end of the hearing, was upset after running into her children's father, and was upset the judge did not increase her visitation rights, but she was proud of her progress and said she would continue to take medication. (Tr. 554). She also said she could trace many of her poor decisions and problems to alcohol. (Tr. 554). Plaintiff went to counseling with Mr. Hunyadi on

9

February 15, 2010 and her mood showed reduced lability, with less depression. (Tr. 533). On February 19, 2010, Mr. Terlonge noted Plaintiff appeared to have been sleeping before her appointment. (Tr. 553). Plaintiff said she was doing great, explaining she had been keeping all her appointments lately and would continue to do so. (Tr. 553). She saw Mr. Terlonge again on March 12, 2010 and initially said things were "going fine" but eventually admitted testing positive for cocaine. (Tr. 552). She did not exhibit suicidal ideation but cried and believed people were too harsh on her. (Tr. 552). Plaintiff said she did not use much cocaine and did not know why she did it in the first place. (Tr. 552). She began to weep, expressing an understanding that she needed to make life changes. (Tr. 552). At a March 17, 2010 counseling appointment with Mr. Hunyadi, Plaintiff had increased anxiety and had made no progress. (Tr. 534).

Plaintiff presented to the emergency room on March 30, 2010 because she was suicidal after learning her caseworker recommended she permanently lose her children. (Tr. 441). She admitted drinking and using cocaine, had not taken her medications, and had cut herself. (Tr. 441). Plaintiff "just d[id] not see the point anymore." (Tr. 441). Her blood alcohol level was 0.15. (Tr. 442). She was diagnosed with depression and superficial abrasions to her left arm, given a tetanus shot, had her wounds dressed, and was ultimately discharged in good condition. (Tr. 440).

Mr. Hunyadi evaluated Plaintiff the next day and indicated her mental status was variable, with periods of depression and anxiety related to situational stressors. (Tr. 520). Plaintiff admitted using cocaine but felt the amount she used was so minimal it would not show up on a drug screen. (Tr. 520). Plaintiff had increased depression and was not coping well with the custody news about her daughters. (Tr. 535, 571).

On April 5, 2010, Plaintiff cried and reported multiple stressors to Dr. Choksi. (Tr. 529). On

10

April 6, 2010, Plaintiff and her boyfriend attended a session with Mr. Terlonge and she said she had forgotten about their previous session. (Tr. 551). She understood she needed to take responsibility for her actions, did not express feelings of hurting herself, and said she had been helping her boyfriend to stay busy. (Tr. 551). At an April 9, 2010 session, Plaintiff felt very hopeless and understood she needed a better life. (Tr. 550). Plaintiff attended counseling on April 14, 2010 and her mood was notable for depression and anxiety. (Tr. 536). She denied substance use and notes indicated she had resumed treatment with Quest. (Tr. 536).

On May 6, 2010, Plaintiff was taken to the emergency room and needed to be restrained because she was combative and screaming. (Tr. 455). Plaintiff said she became violent while drinking, argued with her boyfriend, and cut her left wrist. (Tr. 455). Plaintiff did not respond when asked about her children. (Tr. 455). She was crying out, thrashing, using foul language, and striking out at people. (Tr. 455). Her blood alcohol level was 0.26 and she was diagnosed with acute alcohol intoxication, combative behavior, and a self-induced laceration to her left wrist. (Tr. 454). Over time and after being sedated, Plaintiff became more cooperative. (Tr. 454). Her laceration was sutured, and once she became sober she was no longer suicidal, had total control, and admitted "she did something stupid". (Tr. 453–54).

Plaintiff no-showed to a session with Mr. Terlonge on May 24, 2010, which was attended by her CPS worker. (Tr. 549). The CPS worker did not believe Plaintiff was taking her medications appropriately and had witnessed Plaintiff having a fit of rage. (Tr. 549). He said Plaintiff did not smell drunk at the time and wondered if the outburst was due to medication. (Tr. 549). On May 26, 2010, Mr. Terlonge educated Plaintiff about the importance of not missing appointments and instructed her to straighten out her medications. (Tr. 548).

11

Plaintiff returned to the emergency room on June 1, 2010 due to withdrawal from Cymbalta after forgetting to refill it. (Tr. 466). She did not want to go back on Cymbalta and was a little tearful. (Tr. 466). At first Plaintiff said she did not drink, but she smelled slightly of alcohol and eventually admitted drinking. (Tr. 466). Her blood alcohol level was 0.12 and after receiving medication Plaintiff was "happily reading a book" and had no thoughts of hurting herself. (Tr. 466–67). She said she wanted to follow up at Phoenix Rising. (Tr. 467).

On June 17, 2010, the police took Plaintiff to the hospital after she tried to see her children, was not allowed to do so, became upset, started drinking, and began having thoughts of cutting her wrists. (Tr. 478). Plaintiff was tearful, with healed lacerations on her left forearm. (Tr. 478). Her blood alcohol level was 0.23. (Tr. 475). Prior to discharge, Plaintiff said she felt better once her boyfriend arrived. (Tr. 473). She said she was no longer suicidal, explaining she had too much to drink but felt better and wanted to go home. (Tr. 473). At a June 18, 2010 session with Mr. Terlonge, Plaintiff described an incident in which she became angry, yelled at her boyfriend, and was told to leave the building immediately. (Tr. 547). She was also "not looking forward" to her court hearing and was aware it might not go well. (Tr. 547).

At a June 23, 2010 appointment with Mr. Hunyadi, Plaintiff was tearful and more anxious and depressed. (Tr. 537). The next day, she began to cry and was very nervous about her upcoming hearing during her session with Mr. Terlonge, but was stable for most of the session. (Tr. 546). She understood she might feel pressure to drink again if her life became more depressing and needed to take some precautions. (Tr. 546). On July 6, 2010, Plaintiff cried and told Dr. Choksi she was having a lot of problems. (Tr. 527). She was not taking Cymbalta because she had not been able to fill it but took her other medications regularly. (Tr. 527). On July 9, 2010, Plaintiff cried during most of her

12

session with Mr. Terlonge due to a text from her mother. (Tr. 545). Plaintiff was very upset about missing seeing her youngest daughter grow up and cried profusely, stating she could not function without her daughters. (Tr. 545). She said the past year had been hell and noted she was trying to distance herself from friends who used drugs. (Tr. 545). Plaintiff felt she was being forced not to have human emotions and found it difficult to control herself. (Tr. 545).

Plaintiff was agitated and upset when she returned to Phoenix Rising on July 15, 2010. (Tr. 538). She admitted testing positive for alcohol but continued to deny drinking for the past several months. (Tr. 538). On July 22, 2010, Plaintiff saw Mr. Terlonge and was calm at first but became upset as her session progressed. (Tr. 544). She was very focused on trying to prove alcohol tests could give false positives, stating she worked with chemicals that had a high level of alcohol. (Tr. 544). Plaintiff needed to be calmed down frequently and did not want to go to Quest anymore, describing it as a waste of time and saying she did not have time to go because she was "working every day of the week." (Tr. 544). On July 30, 2010, Plaintiff was slightly more agitated when she saw Mr. Terlonge. (Tr. 543). She said her life was nothing without her children. (Tr. 543).

On August 10, 2010, Plaintiff was admitted for evaluation at Crisis Intervention and Recovery Center when she drank after a court hearing during which she permanently lost custody of her children. (Tr. 487). When she was admitted, she was severely mentally disabled and suicidal. (Tr. 492). Plaintiff was experiencing increased suicidal thoughts, saw few other solutions, felt somewhat trapped, and felt moderate and increasing anxiety. (Tr. 497). She discussed the custody issues with her children and said she was working full time at a tanning salon but had very low wages and an erratic work schedule. (Tr. 487, 494, 496). She said she drank a beer every two weeks and had last used cocaine in March 2010. (Tr. 487). Plaintiff was casually dressed and maintained

13

good eye contact. (Tr. 487). She became sad when discussing her children and had severely impaired insight and judgment, but denied hallucinations and suicidal ideation. (Tr. 487). During an inpatient mental status examination she was depressed, tearful, and sobbing at times, with restless and fidgety motor activity. (Tr. 504). She was diagnosed with bipolar disorder, not otherwise specified, and alcohol abuse. (Tr. 505). Her GAF was 41.[3] (Tr. 505). While in treatment she was also diagnosed with mood disorder, not otherwise specified, and borderline personality disorder with narcissistic features and assigned a GAF of 50.[4]

On August 12, 2010, Plaintiff was crying and had accelerated speech at her session with Mr. Terlonge. (Tr. 542). She felt everything was falling apart because she was going to lose her medical and food stamps, but eventually calmed down and said she would not hurt herself. (Tr. 542). The next day Plaintiff was still very upset and concerned but no longer felt like hurting herself and said she would stay away from non-prescribed mood altering substances. (Tr. 541). She also said she was not going to work anymore. (Tr. 541). On August 16, 2010, Plaintiff told Mr. Terlonge about her recent psychiatric hospitalization. (Tr. 540). He advised her to stop using alcohol as a coping method, and Plaintiff said she was doing better despite her hospital stay. (Tr. 540).

On August 13, 2010, police took Plaintiff to the emergency room after her boyfriend called them and said she was suicidal. (Tr. 511). Plaintiff said she did not know what her boyfriend was talking about and just wanted to go home, but she had multiple lacerations on her left wrist. (Tr. 511). She admitted drinking and was uncooperative, combative, and verbally abusive to the staff to

---

3. A GAF between 41 and 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting); or any serious impairment in social, occupational, or school functioning. *DSM-IV-TR*, at 34.

4. *See* footnote 3, *supra*.

14

the point she was placed in a waist restraint. (Tr. 511). Plaintiff was calmer and more cooperative after being restrained, but she was extremely tearful. (Tr. 511). Examination revealed a small gaping laceration that required wound repair on her left wrist. (Tr. 511). Later, Plaintiff remained extremely combative, screaming, yelling, and fighting with the staff even after drugs were administered. (Tr. 508). Her blood alcohol level was 0.18, and she had to be placed in four-point leather restraints at one point. (Tr. 508). Once Plaintiff's blood alcohol reduced to 0.02, she was bright, alert, and cooperative, denied suicidal or homicidal ideation, and was reasonable. (Tr. 508). She said it was just "anger talking" and denied wanting to kill herself, her mother, or her boyfriend, despite having screamed homicidal thoughts about them earlier. (Tr. 508).

On August 16, 2010, Plaintiff told Mr. Terlonge she was doing better and explained she had been drunk during her hospitalization. (Tr. 608). On August 19, 2010, Plaintiff continued to tell Mr. Terlonge she would stay away from alcohol. (Tr. 607). At counseling with Mr. Hunyadi on August 31, 2010, Plaintiff had increased depression and was struggling due to the court decision regarding her children. (Tr. 539). Notes indicated she should be seen more frequently. (Tr. 539). Plaintiff saw Dr. Choksi on September 14, 2010, was alert and cooperative, and denied substance use. (Tr. 652). Despite crying at times, her mood was better. (Tr. 652). She reported mood changes and anxiety, saying she had a lot of problems and could not work. (Tr. 525). She was taking medications as prescribed but was sleeping poorly, had an anxious mood, and was unhappy and on-edge. (Tr. 525).

On October 15, 2010, Mr. Terlonge noted working out helped Plaintiff feel better. (Tr. 604). The following month, Plaintiff told Mr. Terlonge things were relatively stable. (Tr. 603). Plaintiff agreed staying in the house could worsen her depression but said she had nowhere to go. (Tr. 603). On November 22, 2010, Plaintiff "appear[ed] to be demonstrating the characteristics of someone

15

who ha[d] given up", but did not have feelings of hurting herself. (Tr. 602). When Plaintiff saw Mr. Terlonge on November 23, 2010, she was upset, used curse words, and was difficult to redirect. (Tr. 601). Plaintiff screamed, spoke with very accelerated speech, and calmed down only to excite herself again. (Tr. 601). A few days later, Plaintiff was "doing relatively OK" but expressed frustration. (Tr. 600). Plaintiff's boyfriend was concerned with how frequently she cried for no reason, and Plaintiff admitted she did not utilize many therapy or relaxation techniques. (Tr. 600).

Plaintiff saw Dr. Choksi on November 30, 2010, denied substance use, and said she was doing well but reported some depressive episodes and crying due to loneliness. (Tr. 650). When Plaintiff went to counseling with Mr. Hunyadi the same day, her thinking appeared less muddled and she showed a slight decrease in depression. (Tr. 598). She had improved cognition, was less tearful, and appeared to be coping better. (Tr. 598). Mr. Terlonge also noted Plaintiff was doing well and no longer felt like drinking. (Tr. 599). Plaintiff returned to Mr. Terlonge on December 20, 2010 and said she was doing fine. (Tr. 597). On January 12, 2011, Mr. Terlonge reminded Plaintiff of the importance of getting out of the house more often and instructed her that her tendency to stay inside and play video games could increase her depression. (Tr. 596). Plaintiff indicated things were going relatively well and she understood the dangers of drinking. (Tr. 596).

Plaintiff saw Mr. Hunyadi on January 21, 2011 and was slightly less depressed. (Tr. 594). Plaintiff also met with Mr. Terlonge and her social security lawyer that day. (Tr. 595). Plaintiff said she was having a "good day", but at one point Mr. Terlonge needed to calm her. (Tr. 595). Mr. Terlonge said Plaintiff's lawyer understood how her symptoms affected her ability to sustain employment. (Tr. 595). Plaintiff broke down and cried while explaining her symptoms to her lawyer but eventually finished her story. (Tr. 595).

16

Medical History When Plaintiff Was Sober[5]

On February 22, 2011, Plaintiff told Dr. Choksi she had life stressors, could not work, and suffered mood changes and anxiety attacks. (Tr. 704). Plaintiff denied suicidal or homicidal feelings and substance use and had an improved mood, but could not go to public places due to social anxiety. (Tr. 704). On February 28, 2011, Mr. Terlonge noted Plaintiff was fine but frustrated. (Tr. 703). He cautioned her about spending too much time playing video games and Plaintiff acknowledged the importance of a social life. (Tr. 703). On March 3, 2011, Mr. Terlonge said Plaintiff spent most of her time playing video games or working at a tanning salon, but noted she appeared to be reaching her limit with working. (Tr. 702).

Mr. Hunyadi's notes from March 10, 2011 stated Plaintiff was experiencing increased stress. (Tr. 701). On March 24, 2011, Plaintiff was not feeling well and cried during her session with Terlonge, reporting she was tired of everything. (Tr. 700). She had once again been fired and was frustrated with her inability to sustain employment. (Tr. 700). When Plaintiff saw Mr. Terlonge again on April 6, 2011, she was very negative and argumentative and said she "d[id] not care anymore and expect[ed] nothing out of life." (Tr. 699). Plaintiff returned to Mr. Terlonge on April 13, 2011 and denied excessively high levels of anxiety or agitation. (Tr. 698). She understood she was spending too much time at home, which was detrimental to her progress. (Tr. 698). When Plaintiff met with Terlonge on April 15, 2011, she was calm until she attempted to get coffee from a gas station, at which point she became very upset and agitated. (Tr. 696). She was started breathing

---

5. At the ALJ hearing, Plaintiff agreed with the ALJ's statement that she had been sober since April 15, 2011. (Tr. 72–73). However, she denied substance use in her February 22, 2011 appointment with Dr. Choksi and – in stark contrast to other times Plaintiff said she was not drinking – no hospital or other records contradicted her regarding her sobriety in 2011.

heavily and required significant calming down before she could process information – something she said happened every once in a while. (Tr. 696). Mr. Terlonge noted Plaintiff's depression had recently increased and he needed to calm and monitor her after the gas station incident. (Tr. 696).

Plaintiff saw Mr. Hunyadi for counseling on April 29, 2011, exhibited increased depression and frustration, and had made no progress. (Tr. 697). When Mr. Terlonge saw Plaintiff on May 5, 2011, she "was once again sitting at her computer" playing an online game. (Tr. 695). Plaintiff expressed increased feelings of depression and agreed her symptoms were worsening, and Mr. Terlonge educated her about her isolation. (Tr. 695). On May 12, 2011, Plaintiff still had a minimal affect and did not do well in public. (Tr. 694). She again agreed her symptoms were getting worse. (Tr. 694). On May 17, 2011, Plaintiff told Dr. Choksi she was having problems getting out of the house because she was more fearful. (Tr. 692). She was tearful and somewhat agitated. (Tr. 692).

On June 14, 2011, Plaintiff told Mr. Terlonge her daughter was staying with her most of the summer, further explaining she was engaging in relaxation techniques. (Tr. 691). At counseling on June 28, 2011, Plaintiff was frustrated but coping better. (Tr. 690). Plaintiff frequently cried during her July 7, 2011 visit with Mr. Terlonge. (Tr. 689). She continually talked about the past, felt taken advantage of, was easily agitated, and yelled at her boyfriend during the session. (Tr. 689). On July 12, 2011, Plaintiff cried and yelled during most of her session with Mr. Terlonge, was "generally upset", could not express a reason for her depression, and was resistant to calming. (Tr. 688).

When Plaintiff saw Mr. Terlonge on July 29, 2011, she presented with a depressed and anxious mood, persecutory thought content, and agitated and withdrawn behavior. (Tr. 687). Plaintiff's oldest daughter was no longer talking to her because she was afraid of Plaintiff "and her drinking". (Tr. 687). Despite Plaintiff's assurances that she no longer drank, her daughter believed

18

she could "not get over it that easily." (Tr. 687). Plaintiff saw Dr. Choksi on August 8, 2011 and said she was doing better, reporting an improved mood and decreased irritability. (Tr. 684). However, she was not working, was afraid to leave her house, and socialized only with family. (Tr. 684). She denied substance use but was still tearful with anxiety, panic, and only fair energy. (Tr. 684).

On August 15, 2011, Plaintiff's boyfriend attended a session with her and told Mr. Terlonge she was not doing very well, but Plaintiff did not understand why he would say that. (Tr. 683). Her boyfriend said she became depressed every time her daughter left and was often not willing to follow therapeutic recommendations. (Tr. 683). Plaintiff was not entirely invested in the conversation but understood her behaviors tended to increase her depression. (Tr. 683). Notes indicated Plaintiff continued to isolate herself by laying in bed or playing on the computer. (Tr. 683). On August 22, 2011, Mr. Terlonge reported Plaintiff had a depressed mood and affect. (Tr. 682). Plaintiff said her oldest daughter hurt her feelings but she still had a positive relationship with her youngest daughter and understood she should find purpose in life outside being a mother. (Tr. 682).

Plaintiff saw Mr. Hunyadi for counseling on August 23, 2011 and was briefly tearful because her visit with her daughter would end the next day. (Tr. 686). She was trying to make better choices and had made some progress. (Tr. 686). On August 30, 2011, Plaintiff saw Mr. Terlonge at her home and had a euthymic mood and affect. (Tr. 681). She was still in her pajamas and had been sorting things in her house. (Tr. 681). She reported she had not gone to therapy the previous day because she was having a bad day, despite understanding the importance of going, especially when she was not doing well. (Tr. 681). She sometimes felt she just could not go to therapy, but Mr. Terlonge educated her about needing to get out of the house and she said she understood the importance of it. (Tr. 681). On September 14, 2011, Plaintiff saw Mr. Hunyadi for counseling and was noticeably

19

anxious but calmed herself after the session. (Tr. 680).

County Medical Services Determination and Opinion Evidence

County Medical Services (CMS), a unit of the Ohio Department of Jobs and Family Services that uses the same regulations and listing criteria as the Bureau of Disability determination, determined Plaintiff was disabled based on Medical Listing 12.04, Affective disorder, as of March 1, 2010. (Tr. 295–300).

Dr. Choksi completed a mental status questionnaire in September 2010 and noted Plaintiff's mood and affect were often sad and depressed. (Tr. 559). He stated she had anxiety attacks resulting in trouble going out, often needed a companion, and had some paranoia. (Tr. 559). Dr. Choksi also said her concentration and memory were poor and her intelligence was slightly below average. (Tr. 559). Additionally, Dr. Choksi stated Plaintiff had poor insight and judgment and had abused substances to reduce stress. (Tr. 559). He said her attention was fair-to-poor, her understanding was fair, her concentration was poor, and her persistence and ability to complete tasks in a timely fashion were fair. (Tr. 560). Dr. Choksi noted Plaintiff did not like being around crowds and struggled with change, explaining she frustrated easily and became anxious under pressure but could usually handle some routine, repetitive tasks. (Tr. 560).

Mr. Terlonge completed a questionnaire regarding Plaintiff's daily activities in 2010 and noted she would not be able to keep up with necessary household chores on her own. (Tr. 562). He said Plaintiff got along with few people and rarely socialized with friends. (Tr. 562). Mr. Terlonge also explained she had not been able to keep a job longer than two months because anxiety attacks prevented her from going to work. (Tr. 562). Additionally, Mr. Terlonge stated Plaintiff had a high need for rests, poor attendance, and poor stress tolerance. (Tr. 562). He added that her personal

hygiene varied greatly depending on her mood, she had anxiety about public transportation, needed assistance budgeting her finances, and her only hobby was spending time with her animals. (Tr. 563).

On April 29, 2011, Mr. Hunyadi assessed Plaintiff's ability to do work-related activities and Dr. Choksi co-signed. (Tr. 671–72). He stated Plaintiff was markedly impaired (meaning she had a severely limited ability to function) in the following areas: relating to others; deterioration in personal habits; maintaining concentration and attention for extended periods; sustaining a routine without special supervision; performing activities within a schedule, maintaining regular attendance, and being punctual; responding to customary work pressures; performing complex, repetitive, or varied tasks; and behaving in an emotionally stable manner. (Tr. 671–72). He stated Plaintiff had no useful ability to function in the ability to attend meetings and socialize with friends or neighbors. (Tr. 671). He found her moderately limited (meaning she could be on task up to 88 percent of the day) in understanding, remembering, and carrying out instructions; responding appropriately to supervision, coworkers, customary work pressures, and changes in the work setting; and using good judgment. (Tr. 671–72). And he found her mildly limited in her ability to perform simple tasks. (Tr. 672). Mr. Hunyadi said Plaintiff's condition would likely deteriorate if she were placed under stress, especially that of a job. (Tr. 672).

On December 12, 2011, Dr. Choksi, Mr. Hunyadi, and Mr. Terlonge issued a joint statement explaining they believed Plaintiff's mental health symptoms were separate from her addiction, such that she "used substance as a way to self medicate and cope with her situation." (Tr. 710). Though they acknowledged she was a recovering addict, they believed her history and current presentation without the use of substances showed addiction was not the precipitating factor of her disability, also

21

noting she showed signs of panic disorder before reports of addiction became evident. (Tr. 710).

ALJ Hearing

At the beginning of Plaintiff's hearing, she felt uncomfortable with everyone looking at her. (Tr. 53–54). Discussing her job at a tanning salon, Plaintiff testified she only worked part time for a few months, did not get along with the owner, and stopped going to work. (Tr. 57). She also testified she lost her job as a veterinary assistant because her anxiety made it difficult to leave the house and she was fired for not showing up to work. (Tr. 57–58). Additionally, Plaintiff stated she worked as a dancer at a bar so she could self-medicate using alcohol. (Tr. 59–60).

Plaintiff explained she was afraid to leave her house and be around people, stating her symptoms were worse even after resolving her problems with drugs and alcohol. (Tr. 64). She testified she had cancelled and missed appointments due to her fear of leaving the house, further stating sometimes she refused to answer the door when Mr. Terlonge came to her home. (Tr. 66–67). Initially, Plaintiff testified she stopped abusing drugs and alcohol before her children were taken, but she did admit she had a beer here or there and "pee[d] dirty" a couple times. (Tr. 65). After she lost custody of her children, Plaintiff said she started using again. (Tr. 72). The ALJ observed an April 2011 note indicating Plaintiff had stopped drinking, and Plaintiff agreed she had not used anything since that date. (Tr. 72–73). Part way through her testimony, Plaintiff became overwhelmed and needed to take a break, and later it was noted on the record that Plaintiff had been crying off and on through the hearing. (Tr. 73–74, 87).

Plaintiff testified she sometimes did not feel like bathing "for weeks at a time" when she was depressed. (Tr. 78). She also said she did not feel like cleaning and did not want people to come to her house because she was embarrassed about the mess, explaining she sometimes allowed laundry

22

to become so backed up she had to throw items away. (Tr. 79). A typical day consisted of laying in bed and feeding her animals, but she did not take her dogs for walks. (Tr. 81). Plaintiff said she could not spend long on a computer because it caused anxiety and stated she stopped reading because she became depressed. (Tr. 82–83). She said up to five days each week she could not get out of bed other than to use the bathroom, explaining she was not motivated and did not care about anything. (Tr. 84). Plaintiff said she was afraid to ride the bus and did not like to drive alone, which was why she asked Mr. Terlonge to accompany her to the hearing. (Tr. 84). Plaintiff testified her mental health was worse sober than it was when she was drinking. (Tr. 88). She said she did not want to go anywhere and felt like a burden. (Tr. 89). The ALJ asked if she needed another break, but Plaintiff quickly concluded her testimony. (Tr. 89).

Mr. Terlonge testified Plaintiff's condition was growing progressively worse, explaining she sometimes felt she was a burden even to him and refused to answer the door. (Tr. 91). He said Plaintiff previously used alcohol to reduce her anxiety enough to be in public, noting she became more reclusive once she quit drinking and there were times she could not even come into his office or go into a gas station without having a panic attack. (Tr. 92). Mr. Terlonge testified that though she might have a few good days every once in a while, employment would not last long. (Tr. 93).

Responding to a hypothetical, the VE testified someone of Plaintiff's age, education, and work history could work as a warehouse worker, industrial cleaner, or floor waxer if she were limited to simple, routine, repetitive tasks, no fast-paced production requirements, infrequent routine changes, occasional interaction with coworkers, occasional supervision, and no direct interaction with the general public. (Tr. 96–97). If limited to isolation, the VE testified the person could perform the cleaner and floor waxer jobs. (Tr. 99). Finally, the VE testified the person could not sustain

23

employment if she were absent from work two or more times per month. (Tr. 100).

ALJ Decision

The ALJ determined Plaintiff suffered the severe impairments of panic disorder with agoraphobia and alcohol abuse/addiction but her impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26). Specifically, he found when Plaintiff was consuming alcohol she had marked restrictions in activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence, or pace, and one or two episodes of decompensation. (Tr. 28). However, the ALJ stated "there was no probative evidence to support [her] allegations that she could not leave her home to attend appointments or needed to reside in a highly supportive living environment", noting when her blood alcohol level diminished she was stable. (Tr. 28).

Including substance abuse, the ALJ found Plaintiff was limited to medium work; simple, routine, repetitive tasks with no fast-paced production requirements; infrequent changes in routine; occasional interaction with coworkers; occasional supervision; and no direct interaction with the general public; and would be absent two or more times per month. (Tr. 28–29). He summarized her history of hospitalizations when she was drinking, finding no evidence she needed further emergency room treatment after she stopped drinking. (Tr. 32). Based on the RFC including Plaintiff's substance abuse, the ALJ concluded she could not work. (Tr. 32). However, he found if she stopped substance abuse she would no longer miss two or more days of work per month. (Tr. 33–34). Her remaining RFC contained the same mental limitations. (Tr. 34). The ALJ focused on Plaintiff's past work, noting her testimony that she was fired from her veterinarian assistant job for missing work due to panic attacks and stopped working as a dancer after only a few months. (Tr.

24

34). He summarized the record and Mr. Terlonge's testimony regarding her difficulties after ceasing substance abuse. (Tr. 34–36). However, the ALJ found Mr. Terlonge's opinion was based on Plaintiff's subjective reports and he had nonetheless accounted for her social limitations in the RFC. (Tr. 36). The ALJ further noted there was no evidence Plaintiff missed appointments due to a fear of leaving her home and focused on Plaintiff's July 2010 statement that she was working every day. (Tr. 37). This, the ALJ found, showed Plaintiff could maintain employment despite her symptoms. (Tr. 37).

Ultimately, the ALJ determined Plaintiff's overall ability to function improved once she stopped self-medicating with drugs and alcohol. (Tr. 38). He gave significant weight to Dr. Choksi's opinion, finding it consistent with treatment notes, but he found he had accommodated all limitations in the RFC. (Tr. 39). The ALJ rejected the portion of Mr. Hunyadi's opinion stating Plaintiff would miss work, finding no probative evidence supported this notion. (Tr. 39). Relying largely on her function report and work at the tanning salon, he found she would have only moderate limitations in activities of daily living. (Tr. 39–40). Additionally, he noted she was not entirely forthcoming about her work-related activity. (Tr. 40). Based on VE testimony, the ALJ found Plaintiff could perform a significant number of jobs in the national economy and therefore found her not disabled. (Tr. 41–42). The Appeals Council denied review (Tr. 3), making the ALJ's decision the final decision of the Commissioner.

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the

25

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can she perform past relevant work?

5. Can the claimant do any other work considering her residual functional capacity,

26

age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff argues the ALJ erred by finding her former substance abuse was the only factor preventing her from engaging in substantial gainful activity, arguing her substance abuse was not material to her disability and the ALJ misconstrued the evidence because the same evidence the ALJ used to suggest Plaintiff was "quite capable of leaving her house" actually showed she missed treatment appointments and had an at-best sporadic work record. (Doc. 18, at 13–18).

In 1996, Congress amended the Social Security Act to prohibit the award of benefits when alcoholism or drug addiction is a contributing factor material to an individual's disability determination. 42 U.S.C. §§ 423(d)(2)(C) and 1382c(a)(3)(J); *see also Mathews v. Astrue*, 2011 WL 7145221, *7 (N.D. Ohio 2011). The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether the individual would be disabled if he or she stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1); *see Mathews*, 2011 WL 7145221 at *7.

27

In order to determine whether an individual is precluded from benefits, an ALJ must first determine if an individual is disabled, irrespective of substance use. *Id*. § 404.1535(a). Next, the ALJ must determine whether alcohol or drug abuse is a material contributor to the disability. *Mathews*, 2011 WL 7145221 at *7. If the ALJ determines the remaining limitations would not be disabling without substance use, then drug addiction or alcoholism is a "contributing factor material to the determination of disability" and benefits shall not be awarded. *Id*. § 404.1535(b)(2)(I).

The records from Plaintiff's treatment providers at Phoenix Rising showed though she was never hospitalized after she stopped drinking, Plaintiff continued to experience psychological symptoms. She became withdrawn and isolated herself despite continual education about the need to leave the house and have a social life. (Tr. 681, 683–84, 692, 694–95, 698, 702–03). Mr. Terlonge frequently expressed concern about the amount of time Plaintiff spent isolated in her room playing video games or laying in bed and noted her depression and agoraphobia symptoms were worsening, yet she continued this activity. (Tr.681, 683, 694–95, 698, 702–03). Multiple treatment notes reflected Plaintiff's continued fear of leaving the house and panic attacks in public places. (Tr. Tr.681, 683–84, 692, 694, 696, 698, 700, 702, 704). While Defendant argues these merely reflect Plaintiff's subjective complaints, Mr. Terlonge witnessed Plaintiff having a panic attack in public and not getting dressed, and his notes and testimony reflected her tendency to retreat to her computer games rather than venture outside her home. (*See, e.g.,* Tr. 91–93, 681, 683, 696). Moreover, Plaintiff continued to express thoughts of increased depression, negativity, hopelessness, and lack of interest in her life. (Tr. 688, 699, 700).

The ALJ changed only one aspect of Plaintiff's RFC when he determined what she could do when not abusing substances. While all other limitations would remain, he found she would no

longer miss two days of work per month, relying largely on her work at a tanning salon and lack of post-sobriety hospitalizations. (Tr. 39–40). This explanation was insufficient.

The ALJ found no probative evidence Plaintiff would still miss work two days per month if she stopped drinking despite clear testimony from Mr. Terlonge that Plaintiff missed appointments with him after she stopped drinking and sometimes refused to let him in her house, and despite the August 2011 record explaining Plaintiff missed her therapy appointment because she was having a bad day and sometimes "[did] not feel like [therapy] [wa]s something she c[ould] do." (Tr. 681). The ALJ also seemed to think it damaged Plaintiff's credibility that her therapists advised her to leave home more often when she said she was afraid to leave the house (Tr. 40) even though treatment notes made it clear this instruction was meant as advice on how to treat her agoraphobia symptoms and decrease her depression (Tr. 681, 683, 694–95, 702–03).

The ALJ also misconstrued Plaintiff's work at the tanning salon, finding it showed she could work despite her symptoms when in fact it demonstrated the effect Plaintiff's symptoms had on her ability to sustain employment. In March 2011, Plaintiff spent most of her time playing video games and working at the salon, but Mr. Terlonge thought she appeared to be reaching her limits with working. (Tr. 702). A few weeks later, Plaintiff had been fired. (Tr. 700). Shortly after that, she said she did not care about life and expected nothing out of it, had a panic attack at a gas station, and Mr. Terlonge began to notice her symptoms were worsening. (Tr. 694–98). Though the undersigned notes the ALJ referred to July 2010 work, Plaintiff was clearly drinking in July 2010 and he found she was disabled when considering the effects of substance abuse. (*See* Tr. 32, 538). It is not clear how a job Plaintiff "reach[ed] her limits with" and was fired from *after* she stopped drinking supports the conclusion that she would not continue missing work two days per month, particularly

29

in light of ongoing psychological symptoms that led her to isolate herself, miss appointments, and have panic attacks in public.

Defendant urges the Court to interpret the joint statement by Dr. Choksi and Mr. Hunyadi regarding Plaintiff's substance abuse as opining her addiction was separate from her mental health symptoms, somehow reading their statement as supporting the finding that Plaintiff was not disabled once she stopped drinking. (Doc. 19, at 14). But their statement more logically reads as an attempt to inform the Commissioner that Plaintiff's substance abuse was a method of coping with her disabling symptoms, not the cause of the symptoms. As they indicated, her presentation in 2011 without the use of substances showed increasing symptoms of depression and agoraphobia, isolation, and public panic attacks.

The ALJ did not sufficiently articulate why all Plaintiff's other limitations would remain after she became sober except the one that made her disabled. This is particularly true in light of evidence showing she continued to fear leaving her home, isolated herself despite constant direction to leave her house, had panic attacks in public, and missed therapy appointments when she was having bad days. The ALJ found her ability to function improved when she stopped consuming alcohol and drugs but the only apparent improvement was she no longer cut her wrists and required hospitalization. Plaintiff may no longer have been regularly suicidal, but the record showed she continued to experience anxiety and agoraphobia symptoms after she stopped drinking.

As Plaintiff noted, the ALJ's RFC determinations meant he found substance abuse was the only reason she would miss work too often to sustain employment. (*See* Doc. 18, at 18). In so finding, however, the ALJ appears to have largely ignored treatment records documenting her condition during sobriety. He discussed her 2010 daily work, but that pre-dated her sobriety, as did

30

her 2010 function report and Mr. Terlonge's 2010 questionnaire. (*See* Tr. 37, 269, 563). The ALJ also discussed her pre-sobriety records at length, but devoted far less discussion to her post-sobriety records. (*See* Tr. 34–40). He mentioned she feared losing her job, but neglected to mention she was fired shortly thereafter. (Tr. 37, 700). He made a blanket statement finding "no probative evidence" her fear of leaving home was as severe as he alleged, but did not mention the gas station panic attack Mr. Terlonge witnessed, the time she skipped therapy because she had a bad day, Mr. Terlonge's ongoing concerns that her symptoms were worsening, or other 2011 treatment notes indicating she continued to be fearful, cried and yelled in front of Mr. Terlonge, and presented as tearful and noticeably anxious, with agitated and withdrawn behavior. (*See* Tr. 37, 680–81, 684, 687–88, 692, 694–97, 699–701).

Although a number of these observations were based on subjective complaints, much psychological treatment must by its very nature be based on what a patient tells her providers and whether they trust those statements. *See Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1071 n.3 (6th Cir. 1992) (citing *Blankenship v. Bowen*, 874 F.2d 1116 (6th Cir. 1989)) ("[T]he ALJ should not have discounted the psychiatric evidence in such a cavalier manner simply because it was based on 'subjective complaints'" because the court recognized these impairments "do not easily lend themselves to the same degree of substantiation as other medical impairments."); *McDaniel v. Astrue*, 2012 WL 6725650, *6 (N.D. Ohio 2012) (reversing and remanding where the ALJ erred when he rejected a psychiatrist's opinion because it was based on subjective reports elicited during treatment sessions with the plaintiff).

Nothing in the record here suggested Plaintiff's doctors or therapists suspected she was exaggerating or otherwise being dishonest about her symptoms. In fact, their post-hearing statement

31

– explaining her presentation without substances showed addiction was not the "precipitating factor" of her disability – showed they believed at least some of her symptoms remained after she stopped abusing alcohol. Moreover, because Mr. Terlonge witnessed Plaintiff's panic attacks, tendency to isolate herself, and need for someone to accompany her frequently to appointments (Tr. 91–93), his conclusions were based on more than Plaintiff's subjective complaints. Even Plaintiff's presentation at the ALJ hearing showed her difficulty being in public, as she needed Mr. Terlonge to accompany her, was immediately uncomfortable being the center of attention, cried throughout the hearing, needed to take a break to compose herself, and almost needed a second break. (Tr. 53–54, 73–74, 84, 87, 89).

The ALJ's cursory discussion of Plaintiff's condition in the absence of substance abuse – particularly with its stark contrast to his detailed discussion of her pre-sobriety records – makes it unclear whether he sufficiently considered Plaintiff's continuing symptoms when he formulated her RFC. This renders his current decision unsupported by substantial evidence, but does not automatically mean Plaintiff is entitled to benefits. The Court should remand the case for further proceedings consistent with this opinion so the ALJ may adequately explain his RFC finding with relevant medical evidence demonstrating Plaintiff's condition after she ceased abusing drugs or alcohol.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence does not support the ALJ's decision to the extent he insufficiently explained his RFC determination. Therefore, the undersigned recommends the case be reversed and remanded for proceedings consistent with this opinion.

_____s/James R. Knepp, II_____
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).